**IN THE UNITED STATE DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**CHARLES W. PAYNE, JR.,**

                    *Plaintiff,*

**v.**

**CONNOR PAUL JERNIGAN,**

**Serve: Connor P. Jernigan**
          **105 Grannys Bar Road**
          **Hague, VA 22469**

**and**

**TRAVIS WILLIAM BOZEMAN,**                    **Case No.___3:22cv95_____**

**Serve: Travis Bozeman**
          **3295 Essex Mill Road**
          **Dunnsville, VA 22454**

**and**

**THE TOWN OF COLONIAL BEACH, VIRGINIA**

**Serve: India Adams-Jacob**
          **Town Manager**
          **Colonial Beach Town Hall**
          **315 Douglas Ave**
          **Colonial Beach, VA 22443**

                    *Defendants.*

## COMPLAINT

Charles W. Payne, Jr. ("Payne") brings this action under 42 U.S.C. §1983 and various state

law causes of action; the gravamen of his federal action springs from the unnecessary, illegal, and

unjustified assault, battery, and arrest of Payne by Officer Connor P. Jernigan ("Jernigan") and

Sergeant Travis Bozeman ("Bozeman") of the Colonial Beach Police Department ("CBPD"), while they were operating under the color of state law.

### Introductory Statement

This Complaint, for all the causes of action listed, boils down to two basic issues: (a) CBPD Officers Jernigan and Bozeman used excessive force in taking Charles Payne into custody on April 9, 2020; and (b) Jernigan instituted criminal proceedings without probable cause against Payne for brandishing a firearm and obstruction.

The reason an officer takes an individual into custody directly impacts both the substantive Fourth Amendment "unreasonable seizure" analysis and the qualified immunity analysis as well. Therefore, it is important for a Complaint to clearly state the reason why an officer accused of excessive force in making an arrest was making an arrest in the first place. In this case, bodycam footage from Jernigan's bodycam indicates two potential arrest reasons: either (1) an arrest for public intoxication; or (b) an arrest pursuant to Va. Code 37.2-808(G). Counts I-IV plead excessive use of force under *both* theories in the alternative for each officer. Likewise, Counts V and VI, which seek of impose *Monell* liability on the Town of Colonial Beach, plead both theories in the alternative against the Town.

Seizing and prosecuting someone without probable cause implicates both 42 U.S.C. §1983 and state law malicious prosecution. This Complaint pleads both bases for liability against Jernigan for each of the two charges for which he swore out a warrant against Payne: brandishing and obstruction.

Finally, excessive force during an arrest in violation of the Fourth Amendment constitutes a civil battery, and this Complaint pleads battery against each officer.

## Parties

1.      Payne is a domiciliary of the Commonwealth of Virginia, residing in Westmoreland County, Virginia. At the time of the incident, Payne was 60 years old.

2.      Defendant Town of Colonial Beach is a political subdivision of the Commonwealth of Virginia, with its principal offices at Colonial Beach Town Hall, 315 Douglas Ave, Colonial Beach, Virginia 22443.

3.      Defendant Connor P. Jernigan is an adult citizen of the Commonwealth of Virginia, who, at all times relevant to this Complaint was a CBPD officer.

4.      Defendant Travis Bozeman is an adult citizen of the Commonwealth of Virginia, who, at all times relevant to this Complaint, was a CBPD officer.

## Jurisdiction and Venue

5.      This Court exercises subject matter jurisdiction over the federal causes of action arising under 42 U.S.C. §1983 pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343(a)(3). This Court exercises supplemental jurisdiction over the Complaint's state law claims under 28 U.S.C. §1367(a). The Court exercises jurisdiction over the attorney's fees and costs claim for the federal causes of action under 42 U.S.C. §1988.

6.      Venue is laid properly pursuant to 28 U.S.C. § 139l(b) because, Colonial Beach is in this district and the acts and omissions giving rise to this Complaint occurred in this district.

7.      Venue is laid properly in the Richmond Division of the Eastern District of Virginia and is proper pursuant to 28 U.S.C. § 1391 *et seq.* and Eastern District of Virginia Local Rules 3(B)(4) and 3(C) because, Colonial Beach is in this district and the acts and omissions giving rise to this Complaint occurred in this district.

**Facts**

8.      On April 9, 2020 at 7:10 pm, Jernigan received a message from his dispatch to look out for a grey/black ford truck with a ladder rack: Payne's truck.

9.      A relative of Payne had contacted the CBPD, telling the CBPD that Payne: (a) was in the identified car; and (b) had made threats against family members. That message was relayed to Jernigan, and that is why Jernigan was looking for Payne's truck.

10.     Jernigan went to Payne's house. When Jernigan arrived at Payne's house, Bozeman was already there.

11.     Upon his arrival at Payne's house and before speaking to Bozeman, Payne, or anyone else, Jernigan drew his weapon from its holster. His weapon remained drawn during this entire encounter.

12.     Jernigan approached Payne's house. 48 seconds after Jernigan arrived at Payne's house, Payne emerged from the garage adjacent to the right side of his house (the right side as one faces the house from the street) and walked out onto his driveway.

13.     Payne's house sits directly adjacent to his garage, separated by a driveway, approximately 6-10 feet wide.

14.     Payne was standing in his driveway between the right side of his house and his garage.

15.     There is no ingress or egress into or out of Payne's house on the right side of the house (the side facing the garage). In other words, Payne could not access the inside of his house from this position in the driveway where Payne was standing.

16.     Payne was dressed in a tee shirt and shorts and had no weapons on his person.

17.     Payne's hands were both out in the open the entire time he was standing in the driveway during this first encounter with Jernigan.

18.     It was clear that, notwithstanding any previous report that Jernigan and Bozeman may have received that Payne may have possessed a rifle, Payne was not armed with a rifle or any other weapon during this encounter with Bozeman and Jernigan.

19.     Payne did not physically or verbally threaten Jernigan, Bozeman, or any other person present, from the time Jernigan arrived to the time, discussed *infra*, when Jernigan placed Payne in his patrol car in handcuffs.

20.     After Jernigan arrived and approached Payne, Payne spoke to Jernigan and Bozeman for approximately 24 seconds.

21.     Payne then ended this consensual encounter with the officers, disengaged from talking to the officers, turned around, walked away from the officers down the driveway, and went behind the house.

22.     Neither Jernigan nor Bozeman directed Payne to halt; neither told Payne he was being detained for an investigative stop; neither attempted to restrain Payne's liberty in any way.

23.     Neither Jernigan nor Bozeman placed Payne under arrest after that first encounter described in ¶¶11-22 *supra*.

24.     Neither Jernigan nor Bozeman told Payne he was under arrest nor took any action that would constitute putting Payne under arrest.

25.     Neither Jernigan nor Bozeman detained Payne upon responsible suspicion of criminal activity arrest after that first encounter described in ¶¶11-22 *supra*.

26.     Neither Jernigan nor Bozeman made any representation to Payne that he was not free to leave the consensual encounter with Jernigan and Bozeman described in ¶¶11-22 *supra*.

27.     Payne was free to leave that initial encounter with Jernigan and Bozeman, and he did so, without any protest from Jernigan and Bozeman.

28.     Payne's son-in-law, who was also present at Payne's house that morning, then stepped out of the garage to speak with Jernigan and Bozeman.

29.     The son-in-law stated to the officers, after Payne left the area, that there was a rifle in Payne's truck.

30.     Payne's truck was parked in the driveway in front of Payne's house and in front of Payne's garage.

31.     Payne's truck was clearly visible to Jernigan and Bozeman.

32.     It was clear to Jernigan and Bozeman throughout the entire encounter described in this Complaint that Payne never went near his truck.

33.     It was clear to Jernigan and Bozeman throughout the entire encounter described in this Complaint that Payne never procured a rife from the truck.

34.     With Payne having left the scene and now being out of sight of Jernigan's body cam, Bozeman continued to speak with the son-in-law.

35.     Jernigan, with his pistol still drawn, walked across the front of Payne's yard and took up a position behind a truck (not the truck where there had been a report of a rife - a different truck) parked in a different driveway on the left side of Payne's house.

36.     Payne was absent from Jernigan and Bozeman's presence for approximately 3 minutes and 45 seconds.

37.     Payne then returned to the driveway and walked up between his house and his garage, towards Bozeman.

38.     Jernigan saw Payne walking up between his house and his garage.

39.     Payne had not changed clothes. Payne was clearly still not armed with any form of weapon.

40.     When Jernigan saw Payne return, he ran towards Payne, yelling once: "Take your hands out of your pockets," though it is not clear from bodycam footage that Payne had his hands in his pockets.

41.     Payne did not threaten the officers or any other person present.

42.     24 seconds after Payne returned to the driveway between his house and his garage, and walked up the driveway not threatening the officers, Payne said to Jernigan and Bozeman: "I'm fine."

43.     Payne then turned and began to walk away from Jernigan and Bozeman, back down the driveway between the house and the garage.

44.     Payne's truck which, according to the report that Jernigan received, held a rifle, was behind Payne as he was walking away from Jernigan and Bozeman - in other words, Payne was walking away from his truck.

45.     Payne was not armed when he was walking away from Jernigan and Bozeman.

46.     Payne presented no threat to Jernigan and Bozeman.

47.     Payne was making no aggressive moves or threatening moves towards Jernigan and Bozeman.

48.     At this point, Payne was walking away, not running away, from Jernigan and Bozeman.

49.     Both Jernigan and Bozeman could clearly see at this time that Payne presented no threat to them or anyone else in the vicinity.

50.     There was no ingress point into Payne's house anywhere near adjacent to him as Payne was walking down his driveway.

51.     At no time before Payne turned away from the officers and began walking down his driveway had either Jernigan or Bozeman: (a) placed Payne under arrest; or (b) told Payne he was under arrest.

52.     At no time before Payne turned away from the officers and began walking into his house had either Jernigan or Bozeman: (a) detained Payne upon reasonable suspicion of criminal activity; (b) told Payne he was being detained and was not free to go; or (c) told Payne to "Halt, "Stop," or given Payne any command from which Payne would be able to tell he was not free to leave Jernigan or Bozeman's presence.

53.     While Payne was walking away from Jernigan and Bozeman at this point, he was free to do so.

54.     At this point, just after Payne had turned away from Jernigan and Bozeman and was just beginning to walk (not run) away from Jernigan and Bozeman, Jernigan ran after Payne, tackled Payne from behind, grabbed and twisted Payne's wrist, and threw him forcefully towards the ground.

55.     When Jernigan tackled Payne, Payne was not acting aggressively towards Jernigan or Bozeman; he was nowhere near any entrance to his house, and he was walking away from the truck in which Jernigan and/or Bozeman had the report that Payne had a rifle.

56.     When Jernigan tacked Payne, Payne's face and head area impacted the side of Payne's house. Payne landed on top of a stack of ladders that had been resting against his house.

57.     Jernigan and Bozeman pinned Payne on to the stack of ladders and pushed his head against the side of the house.

58.     Jernigan shouted to Payne: "Get on the fucking ground!" after tackling Payne.

59.     When Jernigan shouted this, Payne was already on the ground with Jernigan and Bozeman on his back. Payne was unable to move.

60.     From the time Jernigan began his run towards Payne as described in ¶54 until the time Jernigan pinned Payne to the ground as described in ¶59, Payne did not:

    a.      Fight or resist Jernigan and Bozeman; or

    b.      Flee or run from Jernigan and Bozeman; or

    c.      Make any aggressive or threatening action towards Jernigan and Bozeman.

61.     Payne was simply walking away peacefully in his own yard/driveway to his own house.

62.     At no time during this encounter, from the time Officer Jernigan left his position behind the truck to the time that he tackled Payne, did either Jernigan or Bozeman try to counsel Payne or in any way mitigate the force that they used in detaining Payne.

63.     Neither Jernigan nor Bozeman began with the least violent means of detaining Payne - rather, they immediately rushed him, grabbed him from behind, twisted his wrists behind his back, and drove him headfirst into the side of his house and then, painfully, into ladders lying on the ground.

64.     Jernigan handcuffed Payne while Payne was pinned and lying on the ladders.

65.     Even after handcuffing Payne, neither Jernigan nor Bozeman told Payne that he was under arrest (though he clearly was as soon as Jernigan laid his hands on him).

66.     Nor at this time did either Jernigan or Bozeman tell Payne why he was placed under arrest.

67.     Jernigan and Bozeman's throwing Payne to the ground and handcuffing his hands behind his back injured Payne's thumbs, wrist, and neck.

68.     Jernigan and Bozeman's throwing Payne to the ground and handcuffing his hands behind his back was the proximate cause of the injuries to Payne's thumbs, wrists, and back, causing numbness and pain in both his right and left thumb, and severe pain in his wrists and neck that persists to this day.

69.     Payne incurred doctor's bills to treat the injuries described in ¶¶67-68 *supra*.

70.     Payne lost work opportunities due to the injuries described in ¶¶67-68 *supra.*

71.     Payne endured pain and suffering from the injuries described in ¶¶67-68 *supra.*

72.     Jernigan and Bozeman then placed Payne in Jernigan's squad car.[1]

72a.     The first time Jernigan articulated any reason for his action in forcibly and violently tackling Payne and detaining him was approximately 5 minutes after Payne was placed in Jernigan's squad car.

73.     When Payne was detained in Jernigan's police cruiser, Jernigan began talking with Bozeman and a CBPD sergeant who had arrived after Payne had been placed in the squad car.

74.     During that conversation Jernigan, for the first time, indicated why he placed Payne under arrest.

75.     Jernigan said to the responding sergeant: "He's under arrest for public intoxication."

---

[1] Additional facts relating to the malicious prosecution counts concerning this trip to Jernigan's squad car are more specifically spelled out in the Count VIII *infra*.

76.     Jernigan said nothing at this time about having taken Payne into custody pursuant to: (a) Va. Code §37.2-808(A)(Emergency Custody Orders issued by a magistrate); (b) Va. Code §37.2-808(G)(allowing detaining individuals who meet the criteria for an ECO, but without the entry of an ECO); or Va. Code § 18.2-460 (obstruction).

77.     In the discussion referenced in ¶73 *supra*, Bozeman said: "[Payne's] going to have an ECO," indicating that Bozeman may have thought Bozeman had taken Payne into custody pursuant to Va. Code §37.2-808(G).

78.     At no time during Jernigan and Bozeman's encounter with Payne on April 9, 2020 was there: (a) an outstanding warrant for Payne's arrest; or (b) any Temporary Detention Order ("TDO") in effect related to Payne[2].

79.     That night, on April 9, 2020, Jernigan swore out warrants before a magistrate against Payne for "Public Intoxication and Obstruction"; the obstruction was alleged to be in violation of Va. Code § 18.2-460.[3]

80.     On or about September 3, 2020, Jernigan swore out warrants before a magistrate against Payne for brandishing a firearm in violation of Va. Code § 18.2-282.

81.     On December 8, 2020, upon Payne's motion to strike, the General District Court of Westmoreland found Payne not guilty of the brandishing charge and dismissed that case.

82.     On December 8, 2020, the obstruction of justice charge against Payne was dismissed upon the Commonwealth's Attorney motion for *nolle prosequi*.

---

[2] A Westmoreland magistrate did enter a TDO for Payne one day later, on April 10, 2020. However, on the scene of the incident on April 9, 2020, Jernigan indicated only that he had taken Payne into custody on a "drunk in public" charge.
[3] Payne was served with a summons for Public Intoxication and pre-paid his fine prior to trial. *Commonwealth v. Payne,* Case No. GC20001380-00, Westmoreland County General District Court.

**COUNT I**
**Violation of 42 U.S.C. 1983**
**Excessive Use of Force Making Arrest - Drunk in Public**
**<u>Against Connor P. Jernigan</u>**

83.     Payne repeats the factual allegations set forth in ¶¶1-82.

84.     42 U.S.C §1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

85.     Payne is a citizen of the United States, and Jernigan was a person acting under the color of state law during the actions described in this Complaint.

86.     When Jernigan tackled Payne as described in ¶54, Jernigan arrested, and therefore seized, Payne.

87.     When Jernigan arrested Payne, Jernigan was required by clearly established law to use only objectively reasonable force, considering the facts and circumstances surrounding him in making the arrest. *Graham v. Connor*, 490 U.S. 397 (1989).

88.     Officer Jernigan was arresting Payne for Intoxication in Public, a violation of Va. Code §18.2-388. Intoxication in public is a Class 4 misdemeanor, *id.,* which is the least severe crime possible in Virginia and would have subjected Payne to no jail time. Va. Code §18.2-11(d).

89.     Payne posed no immediate threat to Jernigan's or others' safety in the vicinity of the incident:

        a.     Payne was not armed at any time during his encounter with Jernigan.

b.      It was objectively obvious to Jernigan, given the clothes that Payne was wearing, that Payne was not carrying a concealed weapon that could have threatened Jernigan's or others' safety.

c.      Payne, though he may have cursed in some of his interactions with Jernigan, never acted threateningly or belligerently towards Jernigan, never physically threatened anyone, and never verbally threatened anyone's health or safety during the encounter.

d.      The only report of potential firearms that Jernigan had received prior to the encounter was that Payne had a rifle in his truck and firearms in the house. Payne never made any move towards his truck at any time during the encounter.

e.      There was no entrance into the house between the garage and the house where Jernigan tackled Payne - in other words, there was no possibility that Payne (even if he were inclined to be going for a weapon in the house) would have imminently gained entrance to his house when Jernigan rushed and tackled him.

f.      Payne was a 60-year-old man who was no match physically for Jernigan and/or any other officer in the vicinity.

90.    Payne was not resisting arrest when Jernigan twisted his hands behind his back and threw him to the ground.

91.    Jernigan never told Payne to stop or halt. Jernigan never told Payne that he was under arrest. He simply ran up to Payne, grabbed and twisted his wrist, told him to "get on the fucking ground," and then tackled him to the ground.

92.    Payne was not attempting to evade arrest by flight.

a.      Jernigan never told Payne that he was under arrest.

b.      Payne had simply said "I'm fine," turned away from Jernigan (not in defiance of any command not to do so) and was walking peacefully (not running) (again, not in any defiance of any command from Jernigan to stop) in the area between his garage and his house.

93.      Given the *Graham* factors discussed above, Jernigan used objectively unreasonable force in arresting Payne for violating Va. Code §18.2-388 when he rushed Payne from behind, grabbed and twisted his wrist, threw him headfirst into the side of his house and then onto the ground, and handcuffed him, injuring Payne's thumbs and his wrists and his neck in the process.

94.      Jernigan acted maliciously, willfully, or with a reckless and wanton disregard of Payne's constitutional rights.

## COUNT II
## Violation of 42 U.S.C. 1983
## Excessive Use of Force Making Arrest - Drunk in Public
## <u>Against Travis Bozeman</u>

95.      Payne repeats the factual allegations set forth in ¶¶1-94.

96      42 U.S.C §1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

97.      Payne is a citizen of the United States, and Bozeman was a person acting under the color of state law during the actions described in this Complaint.

98.      When Bozeman joined Jernigan in tackling Payne as described in ¶54, Bozeman arrested, and therefore seized, Payne.

14

99.     When Bozeman arrested Payne, he was required by clearly established law to use only objectively reasonable force, considering the facts and circumstances surrounding him, in making the arrest. *Graham v. Connor*, 490 U.S. 397 (1989).

100.     Officer Bozeman was arresting Payne for Intoxication in Public, a violation of Va. Code §18.2-388. Intoxication in public is a Class 4 misdemeanor, *id.,* which is the least severe crime possible in Virginia and would have subjected Payne to no jail time. Va. Code §18.2-11(d).

101.     Payne posed no immediate threat to Bozeman's or others' safety in the vicinity of the incident:

a.     Payne was not armed at any time during his encounter with Bozeman.

b.     It was objectively obvious to Bozeman, given the clothes that Payne was wearing, that Payne was not carrying a concealed weapon that could have threatened Bozeman's or others' safety.

c.     Payne, though he may have cursed in some of his interactions with Bozeman, never acted threateningly or belligerently towards Bozeman, never physically threatened anyone, and never verbally threatened anyone's health or safety during the encounter.

d.     The only report of potential firearms that Bozeman had received prior to the encounter was that Payne had a rifle in his truck and firearms in the house. Payne never made any move towards his truck at any time during the encounter.

e.     There was no entrance into the house between the garage and the house where Bozeman tackled Payne - in other words, there was no possibility that Payne (even

if he were inclined to be going for a weapon in the house) would have imminently gained entrance to his house when Bozeman rushed and tackled him.

     f.     Payne was a 60-year-old man who was no match physically for Bozeman and/or any other officer in the vicinity.

102.     Payne was not resisting arrest when Bozeman joined Jernigan in twisting Payne's hands behind his back and throwing him to the ground.

103.     Bozeman never told Payne to stop or halt. Bozeman never told Payne that he was under arrest. He simply ran up to Payne, grabbed him and then tackled him to the ground.

104.     Payne was not attempting to evade arrest by flight.

     a.     Bozeman never told Payne that he was under arrest.

     b.     Payne had simply said "I'm fine," turned away from Bozeman (not in defiance of any command not to do so) and was walking peacefully (not running) (again, not in any defiance of any command from Bozeman to stop) in the area between his garage and his house.

105.     Given the *Graham* factors listed above, Bozeman used objectively unreasonable force in arresting Payne for violating Va. Code §18.2-388 when he rushed Payne from behind, grabbed and twisted his wrist, threw him headfirst into the side of his house and then onto the ground, and handcuffed him, injuring both Payne's thumbs and his neck in the process.

106.     Bozeman acted maliciously, willfully, or with a reckless and wanton disregard of Payne's constitutional rights.

## COUNT III
### Violation of 42 U.S.C. 1983
### Excessive Use of Force Making Arrest - Va. Code 37.2-808(G)
### <u>Against Connor P. Jernigan</u>

107.     Payne repeats the factual allegations set forth in ¶¶1-106.

108.     42 U.S.C §1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

109.     Payne is a citizen of the United States, and Jernigan was a person acting under the color of state law during the actions described in this Complaint.

110.     When Jernigan tackled Payne as described in ¶54, Jernigan arrested or detained, and therefore seized, Payne.

111.     When Jernigan arrested Payne, he was required by clearly established law to use only objectively reasonable force, considering the facts and circumstances surrounding him in making the arrest. *Graham v. Connor*, 490 U.S. 397 (1989).

112.     Officer Jernigan was arresting Payne pursuant to Va. Code 37.2-808(G). This statute allows a law enforcement officer to take an individual into custody "when he has probable cause to believe that any person (i) has a mental illness and that there exists a substantial likelihood that, as a result of mental illness, the person will, in the near future, (a) cause serious physical harm to himself or others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information, if any, or (b) suffer serious harm due to his lack of capacity to protect himself from harm or to provide for his basic human needs,

(ii) is in need of hospitalization or treatment, and (iii) is unwilling to volunteer or incapable of volunteering for hospitalization or treatment.

113.     The Commonwealth's proceeding under Va. Code 37.2-808(G) would have subjected Payne to no jail time.

114.     Payne posed no immediate threat to Jernigan's or others' safety in the vicinity of the incident:

a.     Payne was not armed at any time during his encounter with Jernigan.

b.     It was objectively obvious to Jernigan, given the clothes that Payne was wearing, that Payne was not carrying a concealed weapon that could have threatened Jernigan's or others' safety.

c.     Payne, though he may have cursed in some of his interactions with Jernigan, never acted threateningly or belligerently towards Jernigan, never physically threatened anyone, and never verbally threatened anyone's health or safety during the encounter.

d.     The only report of potential firearms that Jernigan had received prior to the encounter was that Payne had a rifle in his truck and firearms in the house. Payne never made any move towards his truck at any time during the encounter.

e.     There was no entrance into the house between the garage and the house where Jernigan tackled Payne - in other words, there was no possibility that Payne (even if he were inclined to be going for a weapon in the house) would have imminently gained entrance to his house when Jernigan rushed and tackled him.

f.     Payne was a 60-year-old man who was no match physically for Jernigan and/or any other officer in the vicinity.

115.    Payne was not resisting arrest or resisting Jernigan's attempts to detain him when Jernigan twisted Payne's hand behind his back and threw him to the ground.

116.    Jernigan never told Payne to stop or halt. Jernigan never told Payne that he was under arrest. He simply ran up to Payne, grabbed and twisted his wrist, told him to "get on the fucking ground," and then tackled him to the ground.

117.    Payne was not attempting to evade arrest or detention by flight.

      a.    Jernigan never told Payne that he was under arrest.

      b.    Payne had simply said "I'm fine," turned away from Jernigan (not in defiance of any command not to do so) and was walking peacefully (not running) (again, not in any defiance of any command from Jernigan to stop) in the area between his garage and his house.

118.    Given the *Graham* factors listed above, Jernigan used objectively unreasonable force in arresting or detaining Payne pursuant to Va. Code 37.2-808(G) when he rushed Payne from behind, grabbed and twisted his wrist, threw him headfirst into the side of his house and then onto the ground, and handcuffed him, injuring both Payne's thumbs and his neck in the process.

119.    Jernigan acted maliciously, willfully, or with a reckless and wanton disregard of Payne's constitutional rights.

## COUNT IV
### Violation of 42 U.S.C. 1983
### Excessive Use of Force Making Arrest - Va. Code 37.2-808(G)
### <u>Against Travis Bozeman</u>

120.    Payne repeats the factual allegations set forth in ¶¶1-119.

121.    42 U.S.C §1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

122.   Payne is a citizen of the United States, and Bozeman was a person acting under the color of state law during the actions described in this Complaint.

123.   When Bozeman joined Jernigan in tackling Payne as described in ¶54, Bozeman arrested or detained, and therefore seized, Payne.

124.   When Bozeman arrested and detained Payne, he was required by clearly established law to use only objectively reasonable force, considering the facts and circumstances surrounding him in making the arrest or the detention. *Graham v. Connor*, 490 U.S. 397 (1989).

125.   Officer Bozeman was arresting Payne pursuant to Va. Code 37.2-808(G). This statute allows a law enforcement officer to take an individual into custody "when he has probable cause to believe that any person (i) has a mental illness and that there exists a substantial likelihood that, as a result of mental illness, the person will, in the near future, (a) cause serious physical harm to himself or others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information, if any, or (b) suffer serious harm due to his lack of capacity to protect himself from harm or to provide for his basic human needs, (ii) is in need of hospitalization or treatment, and (iii) is unwilling to volunteer or incapable of volunteering for hospitalization or treatment.

126.   The Commonwealth proceeding under Va. Code 37.2-808(G) would have subjected Payne to no jail time.

127.    Payne posed no immediate threat to Bozeman's or others' safety in the vicinity of the incident:

a.    Payne was not armed at any time during his encounter with Bozeman.

b.    It was objectively obvious to Bozeman, given the clothes that Payne was wearing, that Payne was not carrying a concealed weapon that could have threatened Bozeman's or others' safety.

c.    Payne, though he may have cursed in some of his interactions with Bozeman, never acted threateningly or belligerently towards Bozeman, never physically threatened anyone, and never verbally threatened anyone's health or safety during the encounter.

d.    The only report of potential firearms that Bozeman had received prior to the encounter was that Payne had a rifle in his truck and firearms in the house. Payne never made any move towards his truck at any time during the encounter.

e.    There was no entrance into the house between the garage and the house where Bozeman tackled Payne - in other words, there was no possibility that Payne (even if he were inclined to be going for a weapon in the house) would have imminently gained entrance to his house when Bozeman rushed and tackled him.

f.    Payne was a 60-year-old man who was no match physically for Bozeman and/or any other officer in the vicinity.

128.    Payne was not resisting arrest or resisting Bozeman's attempts to detain him when Bozeman twisted Payne's hand behind his back and threw him to the ground.

129.    Bozeman never told Payne to stop or halt.

130.    Bozeman never told Payne that he was under arrest.

131.    Bozeman simply ran up to Payne, grabbed and twisted his wrist, and then tackled him to the ground.

132.    Payne was not resisting arrest or resisting Bozeman's attempts to detain him when Bozeman joined Jernigan in throwing Payne to the ground.

133.    Payne was not attempting to evade arrest or detention by flight.

      a.    Bozeman never told Payne that he was under arrest.

      b.    Payne had simply said "I'm fine," turned away from Bozeman (not in defiance of any command not to do so) and was walking peacefully (not running) (again, not in any defiance of any command from Bozeman to stop) in the area between his garage and his house.

134.    Given the *Graham* factors listed above, Bozeman used objectively unreasonable force in arresting or detaining Payne pursuant to Va. Code 37.2-808(G) when he rushed Payne from behind, grabbed and twisted his wrist, threw him headfirst into the side of his house and then onto the ground, and handcuffed him, injuring both Payne's thumbs and his neck in the process.

135.    Bozeman acted maliciously, willfully, or with a reckless and wanton disregard of Payne's constitutional rights.

**COUNT V**
**Violation of 42 U.S.C. 1983**
**Excessive Use of Force Making Arrest - Drunk in Public**
***Monell* Liability for Failure to Train**
**Against The Town of Colonial Beach**

136.    Payne repeats the factual allegations set forth in ¶¶1-135.

137.    The Fourth Circuit has identified four avenues through which a §1983 plaintiff may hold a municipality liable for a policy or custom: (1) through an express policy, such as a

written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) *through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens*; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law. *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 217 (4th Cir. 1999)). This Count V relies on the emphasized portion of *Lytle.*

138.    Because *Monell* liability cannot be predicated on a theory of *respondeat superior*, a single incident is *almost* never enough to warrant municipal liability. *See Semple v. City of Moundsville*, 195 F.3d 708, 713-14 (4th Cir. 1999) ("[P]roof of a single incident of the unconstitutional activity charged is not sufficient to prove the existence of a municipal custom.").

139.    However, the U.S. Supreme Court has left open the possibility that one incident may be sufficient to show a training necessity - "in light of the duties assigned to specific officers or employees[,] the need for more or different training may be so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need" for training— this is the so-called *Canton* exception explained exactly 2 months after the incident at issue in this Complaint by the Fourth Circuit in *Estate of Jones v. City of Martinsburg*, 961 F.3d 661, 672 (4th Cir. June 9, 2020).

140.    **Exhibit 1** is a Freedom of Information Act ("FOIA") request that Payne, by his counsel, sent to the Town of Colonial Beach. ¶2 of **Exhibit 1** lists the training documents that Payne requested.

141.    **Exhibit 2** is the FOIA response cover letter received from Colonial Beach. For every training record requested under ¶2, Colonial Beach responded: "Unfortunately, records do not exist for all the other documents requested." These records referenced in Colonial Beach's response include ALL the training records requested by Payne's FOIA request.

142.    It is a fair inference that the absence of the requested documents means that the training described in ¶2 of Payne's FOIA request did not occur.

143.    It was clear that arresting individuals for public intoxication in violation of Va. Code §18.2-388 was a duty specifically assigned to Colonial Beach police officers (**Exhibit 3, Colonial Beach Police Policy and Procedure Manual, Section IV(Q), p. 10 of 17, specifically setting out the procedure for arresting someone for public intoxication).** Therefore, the need for training officers on the constitutional limitations on the use of force for such arrests is obvious. In 2019, the latest year for which data is available, the Colonial Beach police department reported that it made 81 total arrests, 31 of which fall into the "Group B" category, containing public drunkenness. *See* https://vasheriff.org/wp-content/uploads/2020/05/UPDATED-2019-Crime-Report-1.pdf, p.14 (for numbers of arrests) and p. 18 (for definition of "Group A" and "Group B" offenses). Certainly, given the frequency of arrests that could be expected given past data, the need for training when this incident happened on the *Graham* factors for making an arrest is obvious.

144.    Colonial Beach failed to train its officers in general, and Officers Jernigan and Bozeman specifically, on the *Graham* factors or any other constitutional principles that bear on the question of force that could be employed constitutionally in arresting Payne on April 9, 2020, for a Class 4 misdemeanor.

145.    One can infer, given:

(a) Colonial Beach specifically assigned its police officers to duty to arrest citizens for public intoxication: and

(b) there are clear, well-established constitutional standards limiting the use of force in such misdemeanor, no-jail-time arrests; and

(c) the year before Jernigan and Bozeman arrested Payne, the Colonial Beach police department effected 81 arrests, 31 of which falling into the less severe misdemeanor category like public intoxication, so it was entirely foreseeable that Colonial Beach police would have the occasion to make low-misdemeanor arrests; and

(d) Colonial Beach gave absolutely no training to its police officers on constitutional restrictions on using force in effecting such a Class-4-misdemeanor-no-potential-jail-time arrests - in other words, the training program was inadequate because it was non-existent; and

(e) such lack of training would so obviously result in Officers Jernigan and Bozeman violating Payne's constitutional rights when faced with arresting Payne for a Class 4 misdemeanor in this circumstance, that Colonial Beach's failure to train could properly be characterized as deliberate indifference to Payne's constitutional rights - "even without [Payne showing] a pattern of constitutional violations." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n.10 (1989).

146.    Even in the policies that Colonial Beach had in place regarding arrests, **Exhibit 3**, not one mention is made of any constitutional limitation on arrests, much less the subset of excessive force requirements under the Fourth Amendment. Even if Officers Jernigan and Bozeman recognized the inadequacy of their training and decided to study themselves Colonial Beach's policies on arresting citizens, those policies are silent on the constitutional dimensions

of arresting citizens and the force allowed to be used to make such arrests. This just further underlies that inadequacy of Colonial Beach's utter lack of training on the constitutional dimensions of arresting a citizen.

147.    That inadequacy in training was the proximate cause of Jernigan and Bozeman's using excessive force to arrest Payne for being drunk in public.

**COUNT VI**
**Violation of 42 U.S.C. 1983**
**Excessive Use of Force Making Arrest - Va. Code 37.2-808(G)**
***Monell* Liability for Failure to Train**
**<u>Against The Town of Colonial Beach</u>**

148.    Payne repeats the factual allegations set forth in ¶¶1-147.

149.    The Fourth Circuit has identified four avenues through which a §1983 plaintiff may hold a municipality liable for a policy or custom: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) *through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens*; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law. *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 217 (4th Cir. 1999)). This Count V relies on the emphasized portion of *Lytle.*

150.    Because *Monell* liability cannot be predicated on a theory of *respondeat superior*, a single incident is *almost* never enough to warrant municipal liability. *See Semple v. City of Moundsville*, 195 F.3d 708, 713-14 (4th Cir. 1999) ("[P]roof of a single incident of the unconstitutional activity charged is not sufficient to prove the existence of a municipal custom.").

151.    However, the U.S. Supreme Court has left open the possibility that one incident may be sufficient to show a training necessity - "in light of the duties assigned to specific

officers or employees[,] the need for more or different training may be so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need" for training— this is the so-called *Canton* exception explained exactly 2 months after the incident at issue in this Complaint by the Fourth Circuit in *Estate of Jones v. City of Martinsburg*, 961 F.3d 661, 672 (4th Cir. June 9, 2020).

152.    **Exhibit 1** is a Freedom of Information Act ("FOIA") request that Payne, by his counsel, sent to the Town of Colonial Beach. ¶2 of **Exhibit 1** lists the training documents that Payne requested.

153.    **Exhibit 2** is the FOIA response cover letter received from Colonial Beach. For every training record requested under ¶2, Colonial Beach responded: "Unfortunately, records do not exist for all the other documents requested." These records referenced in Colonial Beach's response include ALL the training records requested by Payne's FOIA request.

154.    It is a fair inference that the absence of the requested documents means that the training described in ¶2 of Payne's FOIA request did not occur.

155.    The Virginia Code, at Va. Code §37.2-808(G) specifically assign to "Law Enforcement Officer[s]" the right and duty to "take . . . into custody" without a warrant individual who meet the criteria for Emergency Custody. Therefore, the need for Colonial Beach to train officers on the constitutional limitations on the use of force for such arrests is obvious.

156.    While there are no readily available statistics on the frequency of Va. Code §37.2-808 detentions in Colonial Beach, the following website, https://static1.squarespace.com/static/589a1500893fc0cdfe2b5fc5/t/5c5a00ec085229534058a3fc/1549402349332/VariationsInCommitmentProceedingsFY16_v1.0_FINAL.pdf, contains data on

TDO and ECO issuance in Virginia per region. *Id.,* at Figure 4, p.7 shows the total number of

ECO's issued in Virginia's 15th Judicial District (where Colonial Beach is located) at 460 in

2016. *Id.* Appendix B shows 14 ECO's and 36 TDO's issued in 2016 in Westmoreland County,

where Colonial Beach is located.

157.    Those numbers reported in 2016 increased between 2016 and the date that Payne

was detained.

https://static1.squarespace.com/static/589a1500893fc0cdfe2b5fc5/t/5f43e0d53ac2030c5f8f57ba/

1598284002107/AnnualReport_FY19.pdf, Figure 1, p.3 shows that total ECO issuances in

Virginia increased from 7963 in 2016 to 8913 in 2019, an increase of 12% over that 3-year

period.

158.    Colonial Beach failed to train its officers in general, and Officers Jernigan and

Bozeman specifically, on: (a) the *Graham* factors; (b) *Estate of Armstrong v. Village of*

*Pinehurst*, 810 F.3d 892 (4th. Cir. 2016)(dealing with use-of-force in taking someone into

custody for a involuntary commitment) factors; or (c) any other constitutional principles that

bear on the question of force that could be employed constitutionally in taking Payne into

custody on April 9, 2020, pursuant to Va. Code §37.2-808(G).

159.    One can infer, given:

(a) Colonial Beach police officers had the authority and the duty under the

Virginia Code to take citizens into custody for mental health evaluations and/or commitments

pursuant to Va. Code §37.2-808(G): and

(b) there are clear, well-established constitutional standards limiting the use of

force in taking citizens into custody pursuant to Va. Code §37.2-808(G); and

(c) by 2019, the year before Jernigan and Bozeman took Payne into custody Va. Code §37.2-808(G), the total number of ECO's in Westmoreland County was, by approximation, 16 (14 increased by 12%), so it was foreseeable that Colonial Beach police officers would have to detain citizens pursuant to Va. Code §37.2-808(G); and

(d) Colonial Beach gave absolutely no training to its police officers on constitutional restrictions on using force in taking citizens into custody pursuant to Va. Code §37.2-808(G); and

(d) such lack of training would so obviously result in Officers Jernigan and Bozeman violating Payne's constitutional rights when faced with detaining Payne pursuant to Va. Code §37.2-808(G) in this circumstance, that Colonial Beach's failure to train could properly be characterized as deliberate indifference to Payne's constitutional rights - "even without [Payne showing] a pattern of constitutional violations." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n.10 (1989).

160.    Even in the policies that Colonial Beach had in place regarding arrests, **Exhibit 3,** not one mention is made of any constitutional limitation on detentions pursuant to Va. Code §37.2-808(G), much less the subset of excessive force requirements under the Fourth Amendment for such arrests. Even if Officers Jernigan and Bozeman recognized the inadequacy of their training and decided to study themselves Colonial Beach's policies on arresting citizens, those policies are silent on the constitutional dimensions of detaining citizens pursuant to Va. Code §37.2-808(G) and the force allowed to be used to make such detentions. This just further underlies that inadequacy of Colonial Beach's utter lack of training on the constitutional; dimensions of arresting a citizen pursuant to Va. Code §37.2-808(G). That inadequacy in training

was the proximate cause of Jernigan and Bozeman's using excessive force to detain Payne

pursuant to Va. Code §37.2-808(G).

**COUNT VII**
**Violation of 42 U.S.C. 1983**
**Malicious Prosecution - Brandishing a Firearm**
**Against Connor P. Jernigan**

161.    Payne repeats the factual allegations set forth in ¶¶1-135.

162.    To make out a claim for malicious prosecution under 42 U.S.C. §1983, Payne

must allege facts that show: "(1) Jernigan seized Payne pursuant to legal process that was not

supported by probable cause; and (2) the criminal proceedings terminated in the plaintiff's

favor. *Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012).

163.    Between April 9, 2020 (the date of the excessive force arrest) and September 1,

2020, Jernigan apparently did no investigation whatsoever about any allegation that Payne had

brandished a firearm. *See* **Exhibit 4, p.3 (detailing Jernigan's investigation of the brandishing**

**charge).** [4]

164.    On September 1, 2020, Jernigan "met with the Commonwealth [sic] Attorney

Julia Sichol in regards to an incident that occurred in the Town of Colonial Beach on 04/09/2020

. . .". *See* **Exhibit 4, p.3**

---

[4] **Exhibit 4** is Jernigan's Incident Report. Under *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159 (4th Cir. 2016), the reasons why Payne attaches **Exhibit 4** to this Complaint controls what deference the Court gives the facts listed in **Exhibit 4.** Payne does ***not*** incorporate by reference into this Complaint the entire **Exhibit 4.** Payne uses **Exhibit 4** in this Complaint simply to list, for Counts VII, VIII, XI, and XII (the malicious prosecutions Counts against Jernigan) the information that Jernigan said he had prior to taking out the warrants at issue in those Counts. That is particularly true for the factual allegations stated in **Exhibit 4** related to the Obstruction charge, where the Complaint notes the discrepancies between Jernigan's body camera footage and the facts that Jernigan recites in **Exhibit 4.** It is definitely NOT Payne's intention to incorporate those facts in Jernigan's false reports into this Complaint.

165.    During that conversation, Sichol advised Jernigan that "Derek Maiden may have been the victim of a brandishing by Charles Payne." *See* **Exhibit 4, p.3.** There is no additional information provided in **Exhibit 4** to determine exactly what the Commonwealth's Attorney told Jernigan about any brandishing incident.

166.    On September 3, 2020, Jernigan interviewed Maiden by phone. Maiden told Jernigan that Payne, while seated "in the driver's seat of his truck in [his] driveway", had "leaned back in the driver's seat[,] which exposed a long gun style firearm" to Maiden in the front seat of Payne's pickup truck, "placed his hand on the firearm," and threatened Maiden and Payne's brother in law. **Exhibit 4, p.3**

167    There is no other discussion in Jernigan's narrative about any additional information anyone provided him about Payne's alleged brandishing.

168.    On September 3, 2020, Jernigan obtained a warrant against Payne for brandishing a firearm in violation of Va. Code §18.2-282. Payne was seized (arrested) on that warrant on September 4, 2020 and taken to the Westmoreland County Sheriff's office - where he bonded out of custody on a personal recognizance bond.

169.    Jernigan did not have probable cause to seize Payne under that warrant, because that warrant was not supported by probable cause.

        a.      Va. Code §18.2-282 makes it unlawful "to point, hold or brandish any firearm . . . in such manner as to reasonably induce fear in the mind of another or hold a firearm . . . in a public place in such a manner as to reasonably induce fear in the mind of another of being shot or injured."

        b.      The long gun reported by Maiden to Payne admittedly counts as a "firearm" under the statute.

31

      c.     Jernigan had no information that Payne had ***pointed*** or ***held*** the firearm in his truck; so Jernigan had to be basing the charge on the "brandishing" of the firearm.

      d.     The Virginia Supreme Court, as it is often wont to do, used the dictionary to define "brandishing" in the context of Va. Code §18.2-282: "Brandish means to exhibit or expose in an ostentatious, shameless, or aggressive manner." *Morris v. Commonwealth,* 269 Va. 127, 135 (2005), *citing Webster's Third New International Dictionary*, 268 (1993).

      e.     According to Jernigan's report from Maiden, Payne took no action to ***exhibit*** his rifle. It was already lying there in plain view in the front seat of his truck. Payne's simply passively "lying [sic] back" in the front seat of his truck did not exhibit the rife in in an ostentatious, shameless, or aggressive manner, and it could not have been Maiden's initial exposure to the sight of the rifle, if the rifle was lying in plain view in Payne's front seat.

      f.     According to Jernigan's report from Maiden, Payne took no action to ***expose*** his rifle. It was already lying there in plain view in the front seat of his truck. No action on Payne's part was required to uncover the rifle for Maiden to see it. *Cf. Morris,* 269 Va. at 135 (evidence sufficient to support brandishing when defendant ***raised his shirt*** to show flare gun to victim with intent to induce fear in the victim)(emphasis added).

      g.     According to Jernigan's report from Maiden, all Payne did was ***touch*** his rifle. Touching does not equate to exhibiting or exposing the rifle.

      h.     At the trial of the brandishing charge, the Westmoreland County General District Court ("GDC") judge struck the Commonwealth's evidence on this charge. This indicates that the Commonwealth's evidence alone (which we can infer was the same evidence that Jernigan relied on to get his warrant) was not sufficient to make out a *prima facie* case of brandishing against Payne.

170.    The criminal proceedings against Payne terminated in Payne's favor. The GDC judge struck the Commonwealth's evidence, found Payne not guilty, and dismissed the case against him.

### COUNT VIII
### Violation of 42 U.S.C. 1983
### Malicious Prosecution - Obstruction
### Against Connor P. Jernigan

171.    Payne repeats the factual allegations set forth in ¶¶1-170.

172.    To make out a claim for malicious prosecution under 42 U.S.C. §1983, Payne must allege facts that show: "(1) Jernigan seized Payne pursuant to legal process that was not supported by probable cause; and (2) the criminal proceedings terminated in the plaintiff's favor. *Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012).

173.    On April 9, 2020, Jernigan swore out a warrant for Payne's arrest for obstruction in violation of Va. Code §18.2-460.

174.    Code § 18.2-460(B) requires that Payne used "a threat" or "force" to "intimidate or impede" a law enforcement office engaged in his duties . . .". In order to constitute a misdemeanor under Code § 18.2-460(B)[5], the obstruction need not be "an actual assault upon the officer, but there must be acts clearly indicating an intention on the part of the accused to prevent

---

[5] Va. Code §18.2-460 has 5 separate subsections, (A)-(E). The warrant itself says only that Payne violated "Section 18.2-460," without specifying the subsection. The write-up under the cited statute makes it clear that Payne was charged under Subsection (B). Payne was not charged under Va. Code §18.2-460(E), which specifically proscribes preventing a law enforcement officer from making an arrest. However, case law discussing Va. Code §18.2-460(B) shows that resisting arrest with the requisite force can constitute a violation of Va. Code §18.2-460(B) – this is probably because Va. Code §18.2-460(E) was not added to the Code until 2018, and the case law predates that 2018 amendment. At any rate, the Complaint will now review Jernigan's statement to look for any facts that could constitute probable cause to believe that Payne violated Va. Code §18.2-460(B) - and to point out where the facts recited in Jernigan's report conflict with what actually happened - as shown by Jernigan's body camera.

the officer from performing his duty." *Jones v. Commonwealth*, 141 Va. 471, 478-79, 126 S.E. 74, 77 (1925). "To 'obstruct' ordinarily implies opposition or resistance by direct action and forcible or threatened means." *Id.* at 479, 126 S.E. at 77. "Merely running away" from an officer as a means of escape is not an obstruction as contemplated by the law. *Id.* at 476, 126 S.E. at 76.

175.    Jernigan's statement contains the following that could possibly bear on an obstruction of justice charge:

a.    As soon as Jernigan arrived at Payne's house on April 9, 2020, Bozeman "asks [Payne] to come talk with us, but he refuses and goes inside the house." **Exhibit 4, p.2.** This cannot constitute a violation of Va. Code §18.2-460(B) because Payne is merely walking away from Bozeman. No law enforcement officer had told Payne to stop or halt; or given Payne any indication that he was under arrest or being detained.

b.    When Payne came out of his house, "Bozeman asked Charles [Payne] to come speak with him and he refused." **Exhibit 4, p.2.** This cannot constitute a violation of Va. Code §18.2-460(B) because, again, Payne is merely walking away from Bozeman and refusing to talk with him. Refusing a voluntary encounter with a police officer cannot be considered obstruction.

c.    "Charles attempted to go back inside the house, but Sgt. Bozeman and myself stopped him by running up behind him[,] grabbing both of his arms and placing him in handcuffs." **Exhibit 4, p.2.** Nothing in that statement indicates that Payne made any threats or exhibited any force to impede Jernigan or Bozeman that would violate Va. Code §18.2-460(B). Additionally, Jernigan's statement is not true. Jernigan's bodycam shows clearly that Payne was not handcuffed until after both Jernigan and Bozeman had driven Payne into the ground on top of the ladders that were lying near the house.

d.      "During the process of trying to place handcuffs on Charles [Payne], he resisted both Sgt. Bozeman and myself." **Exhibit 4, p.2.** Jernigan does not describe what form this "resistance" took. He certainly does not describe any threat or force Payne used to impede either officer from grabbing Payne's arms, twisting them behind his back, and driving him into the ground. Moreover, Jernigan's bodycam footage shows that that statement in Jernigan's report is factually inaccurate. Jernigan's bodycam footage clearly shows that: (a) Jernigan placed handcuffs on Payne *after* Payne was on the ground; and (b) Payne never once offered *any* resistance to Jernigan and Bozeman's either grabbing him, tackling him, or placing him in handcuffs, much less the "threat or force" obstruction required by Va. Code §18.2-460(B).

e.      "Because of Charles [Payne's] attempting to resist us[,] he fell on top of some ladders that were laying [sic] on the ground." **Exhibit 4, p.2.** This is another factual inaccuracy in Jernigan's statement. Jernigan's bodycam shows: (a) Payne offered no resistance to Jernigan or Bozeman anytime during the process he was taken into custody; (b) Jernigan and Bozeman drove Payne down on the ladders; he did not just passively "fall" on the ladders. There is no resistance by Payne described that would rise to the level of "threat or force" obstruction required by Va. Code §18.2-460(B).

(f)      "Bozeman and [Jernigan] had to physically force Charles [Payne] into the back of [Jernigan's] patrol car because of his attempts to obstruct us and resist." **Exhibit 4, p.2.** As a matter of *law*, this allegation is insufficient to constitute probable cause for a violation of Va. Code §18.2-460(B), because there is no allegation that any obstruction rose to the "threats or force" required by Va. Code §18.2-460(B). As a matter of *fact*, that statement is not true; Jernigan's bodycam shows that it took Payne approximately 51 seconds to walk from where he was handcuffed to Jernigan's patrol car. Payne offered no physical resistance during this walk

and hardly said a word to either officer on the way to the patrol car. After Payne arrived in the vicinity of the patrol car, Payne was held outside the patrol car (off camera) while Jernigan entered the front seat of his patrol car and washed his hands. When Jernigan came out of the front seat of the patrol car, Bozeman took Payne by his still-handcuffed arm and guided him (not with force) to the back door of the patrol car to put Payne in the patrol car. Payne and Bozeman then engaged in a discussion, heated at times, for approximately 60 seconds, about why Payne had been arrested. Payne was not during this conversation resisting any law enforcement officer's efforts to put him in the patrol car - and certainly issued no threat and used no force against either Jernigan or Bozeman. Finally, at the end of the discussion with Bozeman, Payne got into the back seat of the patrol car without resisting at all; neither Jernigan nor Bozeman had to "physically force" Payne into the back of Jernigan's patrol car.

176.    At the trial of the obstruction charge, the Westmoreland County General District Court ("GDC") judge entered an order of *nolle prosequi* on the Commonwealth's motion.

177.    The criminal proceedings against Payne terminated in Payne's favor. The GDC judge entered an order of *nolle prosequi* and dismissed the case against him with no finding of guilt.

## COUNT IX
## Battery under Virginia Common Law
## Against Connor P. Jernigan

178.    Payne repeats the factual allegations set forth in ¶¶1-177.

179.    An arrest made with excessive force is a battery as the touching is not justified or excused and is therefore unlawful. *McCracken v. Commonwealth*, 39 Va. App. 254, 262, 572 S.E.2d 493, 497 (2002).

180.     For the reasons stated in Count I *supra,* Jernigan used excessive force in arresting Payne for public intoxication.

181.     For the reasons stated in Count III *supra,* Jernigan used excessive force in arresting Payne to take him into custody pursuant to Va. Code §37.2-808(G).

182.     Because Jernigan used excessive force in taking Payne into custody, under either alternative reason for the arrest, Jernigan's actions in taking Payne into custody constituted a battery.

183.     Payne suffered physical injures, pain, suffering, and humiliation proximately caused by Jernigan's battering him by twisting his arms behind his back, tackling him, and driving him into the ground.

## COUNT X
### Battery under Virginia Common Law
### Against Travis Bozeman

184.     Payne repeats the factual allegations set forth in ¶¶1-183.

185.     An arrest made with excessive force is a battery as the touching is not justified or excused and is therefore unlawful. *McCracken v. Commonwealth*, 39 Va. App. 254, 262, 572 S.E.2d 493, 497 (2002).

186.     For the reasons stated in Count II *supra,* Bozeman used excessive force in arresting Payne for public intoxication.

187.     For the reasons stated in Count IV *supra,* Bozeman used excessive force in arresting Payne to take him into custody pursuant to Va. Code §37.2-808(G).

188.     Because Bozeman used excessive force in taking Payne into custody, under either alternative reason for the arrest, Bozeman's actions in taking Payne into custody constituted a battery.

189.     Payne suffered physical injures, pain, suffering, and humiliation proximately caused by Bozeman's battering him by twisting his arms behind his back, tackling him, and driving him into the ground.

## COUNT XI
### Malicious Prosecution under Virginia Common Law - Brandishing
### <u>Against Conor P. Jernigan</u>

190.     Payne restates the factual allegations in ¶¶1-189

191.     To set forth a *prima facie* case of malicious prosecution under Virginia law, Payne must show that "the prosecution was (1) malicious, (2) instituted by or with the cooperation of the [Jernigan], (3) without probable cause, and (4) terminated in a manner not unfavorable to [Payne]."

192.     As set forth in Count VII *supra*, Jernigan instituted Payne's prosecution for brandishing a firearm without probable cause; and that prosecution terminated favorably to Payne.

193.     Jernigan's requisite malice can be inferred alone from his instituting Payne's prosecution without probable cause.  *Reilly v. Shepherd,* 273 Va. 728 (2007).

194.     Payne suffered emotional distress, damage to his reputation, legal expense, humiliation, and embarrassment proximately caused by the malicious prosecution that Jernigan initiated against Payne.

## COUNT XII
### Malicious Prosecution under Virginia Common Law - Obstruction
### <u>Against Conor P. Jernigan</u>

195.     Payne repeats the factual allegations set forth in ¶¶1-194.

196.     To set forth a *prima facie* case of malicious prosecution under Virginia law, Payne must show that "the prosecution was (1) malicious, (2) instituted by or with the

cooperation of the [Jernigan], (3) without probable cause, and (4) terminated in a manner not unfavorable to [Payne]."

197.    As forth in Count VIII *supra*, Jernigan instituted Payne's prosecution for obstruction without probable cause; and that prosecution terminated favorably to Payne.

198.    Jernigan's requisite malice can be inferred alone from his instituting Payne's prosecution without probable cause.  *Reilly v. Shepherd,* 273 Va. 728 (2007).

199.    Payne suffered emotional distress, damage to his reputation, legal expense, humiliation, and embarrassment proximately caused by the malicious prosecution that Jernigan initiated against Payne.

### Relief Requested:

WHEREFORE, the plaintiff moves for the following relief:

200.    As to Counts I through IV, a money judgment against the named Defendants Jernigan and Bozeman for:

a) $750,000 in compensatory damages, including damages for physical injuries, medical bills, emotional distress, humiliation, and pain and suffering.

b) $500,000 in punitive damages for the named defendants' malicious, willful actions; or for the named defendants' action with a reckless and wanton disregard of Payne's constitutional rights.

c) the plaintiff's attorney's fees and costs pursuant to 42 U.S.C. §1988, including expert witness fees, if any; and

d) pre- and post-judgment interest on any award at the statutory rate.

201.   As to Counts V and VI:

a) An injunction[6] against the Town of Colonial Beach requiring them to conduct training with their law enforcement officers on the *Graham* standards regarding force allowed to be used to make an arrest.

b) A money judgment against Defendant CBPD for $500,000 in compensatory damages, including damages for physical injuries, emotional distress, humiliation, medical bills, and pain and suffering.

c) the plaintiff's attorney's fees and costs pursuant to 42 U.S.C. §1988, including expert witness fees, if any; and

d) pre- and post-judgment interest on any award at the statutory rate.

---

[6] To have standing to maintain this action for an injunction, Payne must allege that it is likely that he would suffer future injury from CBPD offers as he suffered here. *See City of Los Angles v. Lyon*s, 461 U.S. 95, 105 (1983). Case law establishes that such a "likelihood" analysis turns, at least in part, on the size of the citizenry that could be subjected to the unconstitutional excessive force described in this Complaint - the smaller the population size, the more likely members of the population will come into contact with the police department whose members caused Payne's past injury. *Cf. Lyons,* 461 U.S. at 108 (the chances that the plaintiff would be subjected to the same unconstitutional conduct unlikely "in the great city of Los Angles" supports finding of no standing) with *Johnson v. McCowan,* 2021 U.S. Dist. LEXIS 133966 at *14 (W.D. Va. 2021)(Plaintiff, an inmate at Red Onion, injured by corrections officers, would more likely come into future contact with corrections officers than Lyons would in Los Angles, and discovery was appropriate to flesh out the possibility of future harm). Colonial Beach has a population of 3,724 people. *See* https://worldpopulationreview.com/us-cities/colonial-beach-va-population. Colonial Beach has, on information and belief, 11 uniformed officers. These facts, coupled with the fact that Payne still lives in Colonial Beach and the CBPD has shown deliberate indifference to the issue that caused his injury here with a lack of training, takes the possibility of the repeat of this excessive force incident out of the realm of improbable and into the realm of the possible, at least at this pre-discovery phase of this suit.

202.    As to the state law Counts IX-XII, for each count, a money judgement against the applicable defendant, Jernigan or Bozeman for:

a) $750,000 in compensatory damages, including damages for physical injuries, emotional distress, humiliation, and pain and suffering.

b) $350,000 in punitive damages for the applicable defendant's malicious, willful, reckless, and wanton conduct.

c) For the state law causes of action for malicious prosecution (XI and XII), an award of attorney's fees against Defendant Jernigan allowed by *Burruss v. Hines,* 94 Va. 413, 420 (1897).

d) Pre- and post-judgment interest on any award at the statutory rate.

203.    Payne demands a jury trial on all Counts of this Complaint so triable.


**CHARLES W. PAYNE, JR.**

By: /s/ Michael L. Donner, Sr.
        Of Counsel


Michael L. Donner, Sr., Esq. (VSB No. 40958)
mdonner@setlifflaw.com
Setliff Law, P.C.
4940 Dominion Boulevard
Glen Allen, VA 23060
(804) 377-1260 (main number)
(804) 377-1280 (facsimile)
        *Counsel for Plaintiff*